Filed 5/5/23 P. v. Lopez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JESUS MARTINEZ LOPEZ, <br><br> Defendant and Appellant. | H050257 <br> (Monterey County <br> Super. Ct. No. 20CR004441) |

In 2021, defendant Jesus Martinez Lopez pleaded no contest to attempted murder (Pen. Code, §§ 664, 187[1]) and admitted allegations that he personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)) and committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

In 2022, Lopez filed a petition to vacate his attempted murder conviction and be resentenced under former section 1170.95 (hereafter petition).[2] The trial court denied the petition, ruling that Lopez failed to make a prima facie case for relief.

---

[1] Unspecified statutory references are to the Penal Code.

[2] Effective January 1, 2022, the Legislature amended section 1170.95 in several respects. (See Stats. 2021, ch. 551, §§ 1, 2; see also *People v. Birdsall* (2022) 77 Cal.App.5th 859, 865 (*Birdsall*).) The Legislature later renumbered section 1170.95 as section 1172.6, with no change to the text of the statute (Stats. 2022, ch. 58, § 10, eff. June 30, 2022). In this opinion we refer to the current version of any relevant provisions now codified in section 1172.6.

In this appeal, Lopez contends that the trial court erred in denying his petition at the prima facie case stage because the record of conviction does not conclusively establish that he personally acted with the specific intent to kill, as is required for an attempted murder conviction.

For the reasons explained below, we agree. We reverse the trial court's order and remand with directions to issue an order to show cause and conduct further proceedings under section 1172.6.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Complaint and Preliminary Hearing*

On September 4, 2020,[3] the Monterey County District Attorney filed a second amended complaint (complaint) charging Lopez and two codefendants, Joshua Wayne Garcia and Cynthia Edeza, with the willful, deliberate, and premeditated attempted murder of "Victim 1" and "Victim 2" (§§ 664, subd. (a), 187 subd. (a); count 1 [Victim 1] & count 5 [Victim 2]), shooting at an inhabited dwelling (§ 246; count 2), assault with a firearm (§ 245, subd. (a)(2); count 3 [Victim 1] & count 6 [Victim 2]), and street terrorism (§ 186.22, subd. (a); count 7). The information also charged Garcia with illegal possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). All counts were alleged to have been committed on or about April 20.

Additionally, the complaint alleged various enhancements for each count, except counts 6 and 7. For count 1 (attempted murder) and count 2 (shooting at an inhabited dwelling), the complaint alleged that Lopez, Garcia, and Edeza personally inflicted great bodily injury on Victim 1 (great bodily injury or GBI enhancement) (§ 12022.7, subd. (a)).

---

[3] Unless otherwise indicated, all dates were in 2020.

For count 3 (assault with a firearm), the complaint alleged an additional GBI enhancement only as to Lopez and Garcia, not Edeza (§ 12022.7, subd. (a)).

For counts 1 and 5 (attempted murder), the complaint alleged that Garcia (alone) personally used a firearm (§ 12022.5, subd. (a)).

For counts 1 through 5, the complaint alleged the charged offenses were committed for the benefit of a criminal street gang (gang enhancement) (§ 186.22, subd. (b)(1)).

On September 4, the court held a joint preliminary hearing for Lopez and his two codefendants. Victim 1 testified that on April 20, around 9:30 a.m., he and a friend (Victim 2) drove to their friend's house in Salinas.[4] Victim 1 parked his car, and he and Victim 2 walked up to the house. As Victim 1 approached the house he saw a gray Honda with several occupants speed up the street; "it looked suspicious." The Honda stopped for a few seconds. The person in the Honda's front passenger seat "had a big tattoo under the right eye." The Honda drove away and then returned, speeding. The occupants of the car were wearing black and/or black hoodies.

As Victim 1 stood on the side of his friend's house, and as Victim 2 climbed into a window of the house, Victim 1 heard a girl shouting, " 'Get 'em, get 'em.' " Then "they started shooting at [Victim 1]." Victim 1 explained that the shooter was located in the front passenger seat of the Honda (about 18 to 20 feet from Victim 1) and fired about four or five shots. One of the bullets hit Victim 1 in the back, and he dropped to the ground.

Victim 1 testified that he saw the person who shot at him. In court, he identified Lopez as the shooter and person who had the tattoo under his right eye. Victim 1 testified further that he is "[n]inety percent sure" (but not 100 percent sure) that Lopez was the shooter and said, "It looks exactly like him."

_____

[4] Victim 1 is a former Sureño who testified under the pseudonym "John Doe."

3

On cross-examination, Victim 1 acknowledged having told a police officer after the shooting that the tattoo he saw was about one-and-one-half inches below the person's right eye, noticeable, and "was possibly AP or MK or M." Victim 1 also testified that he saw three people in the Honda, but there could have been a fourth person. Victim 1 reiterated on cross-examination that the person in the front passenger seat was the only person who had shot at him and the only person he could "really see."

Detective Gabriela Contreras testified that the police collected eight 9mm cartridge cases at the crime scene. Detective Contreras watched surveillance video recorded before and after the shooting by cameras located near the crime scene. On a video recorded after the shooting, Contreras saw a person in the Honda's rear passenger seat who appeared to have a ponytail. Another video—recorded about 15 minutes after the shooting at the Chin Brothers' market—showed three people exiting the Honda. The front passenger and the driver were wearing black hooded sweatshirts, and the rear passenger (a female) was wearing a purple top and had "hair pulled into a bun." The person who exited the Honda's front passenger seat "had what appeared to be a Huelga bird . . . tattoo below the right eye." A police officer recognized that person as codefendant Garcia. In addition, Lopez was identified as the person who exited the driver's seat. In Detective Contreras's opinion, Garcia matched the description of the shooter provided by Victim 1 while he was at the hospital after the shooting.

On cross-examination, Detective Contreras explained that she could not describe the occupants of the Honda based on the videos recorded before the shooting. She could "just see the bodies within the vehicle." When Victim 1 was interviewed at the hospital, he described the tattoo on the shooter's face as letters; he did not describe the tattoo as a Huelga bird. During the investigation, the police showed Victim 1 a photo lineup that included a photograph of Garcia with a Huelga bird tattoo. Victim 1 did not select Garcia's photograph; he instead selected a different person in the lineup.

4

Salinas Police Officer Nicolas Reyes testified that on a day in April 2020, when he and his partner attempted to contact Garcia, Garcia walked toward a tent, faced an opening in the tent for about three seconds, attempted to discard something, and ran off.[5] Officer Reyes pursued Garcia, and Reyes's partner found a loaded 9mm Beretta handgun and a rifle in the tent.

Mark Babione, a contractor with the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that he examined shell casing exemplars provided by a Salinas Police Department criminalist and entered the exemplars into a ballistic identification and comparison system. The system provided results from which Babione was able to identify three cartridge cases recovered from the crime scene as "high confident candidates" that Babione believed "were fired or stamped from the same firearm," namely the 9mm Beretta.

Salinas Police Department Detective Robert Miller testified as a gang expert. Detective Miller said Garcia has tattoos that are associated with the Norteño criminal street gang, including a Huelga bird under his right eye. Lopez also has Norteño-related tattoos, including a tattoo of four dots. On cross-examination, Miller stated that Lopez's four dots are "under or around his left eye." Miller also thought that he had observed "some type of cursive writing" under Lopez's right eye in the video footage he (Miller) had reviewed during the investigation. As far as Miller knew, Lopez had no tattoos of "AP or MK or M" anywhere on his face and the tattoos under Lopez's right eye were not "pretty big." In addition, Miller said that sharing a firearm is common within a subset of a gang.

---

[5] In questioning Officer Reyes, the prosecutor stated that the date of this contact was "April 4th of 2020." Based on the other evidence, we presume the April 4th date is a misstatement and the contact between Reyes and Garcia occurred after the shooting on April 20.

Neither Lopez nor his codefendants presented any evidence at the preliminary hearing.

Regarding the complaint's enhancement allegations under sections 12022.5 and 12022.7, Garcia's defense counsel argued at the close of the evidence that "it was plain as day that [Victim 1] came in and did not point at [Garcia] as the shooter." Counsel continued: "The only other evidence that I think would even suggest that [Garcia was the shooter] is that at one point in the car he was in the passenger seat and that there was a firearm found near where he was at. [¶] As Officer Miller testified today, it is common for firearms to be passed around within gang members. [¶] I think the evidence is even greater at this point in the hearing that Mr. Garcia was not the shooter based on what came out in court today. The description, there's no description of a Huelga bird on the shooter's face, and we saw the identification in the court. As a result, I'm asking he not be held on those enhancements."

In response to defense counsel's argument, the court asked the district attorney "what evidence presented today do you think would justify either a [section] 12022.5 or a [section] 12022.7 [enhancement allegation] as to Defendant Garcia?"

The district attorney replied: "The fact that the victim has been clear that the shooter was the front-seat passenger. [¶] We have within 15 minutes the suspect car seen on the scene of the crime traveling to Chin Brothers where we see Mr. Garcia exiting the front-seat passenger with the depiction of the tattoo that the victim identified the shooter having. [¶] We also have the direct -- what I think is a direct link to the gun that was found in Mr. Garcia's possession to the scene of the shooting."

After hearing these arguments, the court held Lopez, Garcia, and Edeza to answer on various offenses and enhancement allegations. However, the court did not mention any enhancements under section 12022.5 or section 12022.7 in holding the defendants to answer.

B. *Information, Plea, and Sentencing*

After the preliminary hearing, the district attorney filed an information charging Lopez, Garcia, and Edeza with the same offenses alleged in the complaint, namely, two counts of willful, deliberate, and premeditated attempted murder (§§ 664, subd. (a), 187 subd. (a); count 1 [Victim 1] & count 5 [Victim 2]), shooting at an inhabited dwelling (§ 246; count 2), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); count 3 [Victim 1] & count 6 [Victim 2]), and street terrorism (§ 186.22, subd. (a); count 7). The information also charged Garcia with illegal possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4).

In addition, the information alleged various enhancements for each count, except count 7. The enhancement allegations, however, were not the same as those alleged in the complaint. Specifically, for count 1 (attempted murder), count 2 (shooting at an inhabited dwelling), and count 3 (assault with a semiautomatic firearm), the information alleged GBI enhancements for Victim 1 as to Garcia (but not Lopez or Edeza) (§ 12022.7, subd. (a)).

For counts 3 and 6 (both assault with a semiautomatic firearm counts), the information alleged that Garcia (alone) personally used a firearm (§ 12022.5, subd. (a)).

For counts 1 and 5 (both attempted murder counts) and count 2 (shooting at an inhabited dwelling), the information alleged that a principal (who was not named in the allegation) personally and intentionally discharged a firearm causing great bodily injury to the victim (§ 12022.53, subds. (c), (d), (e)(1)).

For counts 1 through 6, the information alleged gang enhancements (§ 186.22, subd. (b)(1)).

On February 10, 2021, the prosecutor orally moved to amend the information to delete "all language regarding premeditation and deliberation as to Defendant[s] Lopez and Garcia." The trial court granted that request. In addition, for Lopez, the court added a GBI enhancement allegation (§ 12022.7, subd. (a)) to count 1 (attempted murder of

Victim 1). Lopez then pleaded no contest to attempted murder as charged in amended count 1 and admitted the newly attached GBI enhancement allegation and the preexisting gang enhancement allegation. Lopez entered his plea on the condition that he would receive a stipulated sentence of 18 years in prison. The parties also "stipulate[d] to a factual basis" for the plea.[6]

In a corresponding written plea and waiver of rights form, Lopez endorsed the following statement: "I agree there is a factual basis for the plea and that I am responsible for committing each element of each crime to which I plead guilty or no contest and of each special allegation I admit." Lopez also endorsed this statement: "I further understand that a plea of no contest is the same as a plea of guilty for all purposes." Lopez "offer[ed] to the court" the preliminary hearing transcript "as a basis for [his] plea and admissions."

According to the probation officer's report prepared for Lopez's sentencing, Garcia and Edeza entered no contest pleas on the same day as Lopez. Like Lopez, Garcia pleaded no contest to attempted murder and admitted a GBI enhancement allegation (§ 12022.7, subd. (a)) and a gang enhancement allegation (§ 186.22, subd. (b)(1)). Garcia also agreed to a stipulated 18-year prison term.[7] Edeza pleaded no contest to shooting at an inhabited dwelling and agreed to a stipulated sentence of 7 years in prison.

---

[6] The record on appeal includes a minute order for the February 10, 2021 "Change of Plea" proceeding, but not a corresponding reporter's transcript. Thus, the details of any statements made in court are not available in this appeal. The record indicates that the bench officer who presided at the change-of-plea hearing had previously presided at the preliminary hearing. There is no indication in the minute order that Lopez entered his no-contest plea pursuant to *People v. West* (1970) 3 Cal.3d 595. (See *People v. Rauen* (2011) 201 Cal.App.4th 421, 424 [a no-contest plea under *West* does not admit the plea's factual basis, which "allows a defendant to plead guilty in order to take advantage of a plea bargain while still asserting his or her innocence"].)

[7] The details set forth in the probation officer's report regarding Garcia's no contest plea are corroborated by a copy of Garcia's written plea and waiver of rights form, which Lopez submitted as an exhibit to his reply to the district attorney's opposition to the petition for resentencing.

8

In March 2021, pursuant to the stipulated sentence, the trial court sentenced Lopez to 18 years in prison, comprising the lower term of five years for count 1, plus three years for the GBI enhancement and 10 years for the gang enhancement, consecutive. The court dismissed or struck "[a]ll remaining charges, enhancements and/or special allegations."

C. *Proceedings on Petition for Resentencing*

In May 2022, Lopez, on his own behalf, filed a petition requesting resentencing. Lopez declared, inter alia, that an information had been filed against him which allowed the prosecution to proceed under the natural and probable consequences doctrine and that he could not now be convicted of attempted murder because of the changes to sections 188 and 189 effective January 1, 2019. Upon Lopez's request, the trial court appointed counsel to represent Lopez on his petition.

The district attorney filed an opposition to the petition arguing that it should be denied because Lopez failed to state a prima facie case for relief. The district attorney noted that Lopez had admitted personally causing great bodily injury when he admitted the GBI enhancement allegation. The district attorney asserted that "[t]his admission is evidence that [Lopez] was not prosecuted for attempted murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." The district attorney further asserted that "[t]he witness [Victim 1] identified [Lopez] in the courtroom as the 'shooter' " and Lopez's "liability is not based upon the natural and probable consequences doctrine, as he was a direct participant and in fact, used a firearm to try and kill the victim in this case. [Lopez] is seen inside the suspect vehicle before and after the shooting and has been identified as the shooter. As such, he directly perpetrated the crime of attempted murder on the victim." Additionally, regarding aider and abettor liability, the district attorney argued: "Though this case was not prosecuted under the natural and probable consequences doctrine, if it was, [Lopez] would be ineligible for

9

relief. This is because [Lopez,] with intent to kill[,] aided and abetted the occupants of the suspect vehicle by driving the shooters to the scene of the shooting."

Lopez replied to the district attorney's opposition. He asserted that the petition established a prima facie case for relief and that the trial court could not at this stage of the proceedings weigh the evidence presented at the preliminary hearing or make credibility determinations. Lopez asserted further that the district attorney's own recitation of the facts, alternative arguments regarding Lopez's liability as the shooter or an aider and abettor, and assertion at the preliminary hearing that Garcia was the shooter precluded any current argument that Lopez was the actual shooter and necessitated an evidentiary hearing on the petition.[8] In addition, Lopez contended that his admission of the GBI enhancement allegation could have been entered "to avoid liability under the natural and probable consequences doctrine and was not an admission of personally causing great bodily injury." Lopez argued further that his admission did not "encompass the requisite intent" for attempted murder and, because codefendant Garcia had admitted the same GBI enhancement, "[u]nder the People's rationale . . . there are two shooters" and an evidentiary hearing is "necessary for the People to prove that Lopez could have

---

[8] Lopez cited *In re Sakarias* (2005) 35 Cal.4th 140 as support for his argument. In that case, our Supreme Court concluded that "fundamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed. By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth. At least where . . . the change in theories between the two trials is achieved partly through deliberate manipulation of the evidence put before the jury, the use of such inconsistent and irreconcilable theories impermissibly undermines the reliability of the convictions or sentences thereby obtained. In short, in the absence of a good faith justification, '[c]ausing two defendants to be sentenced to death by presenting inconsistent arguments in separate proceedings . . . undermines the fairness of the judicial process and may precipitate inappropriate results.' " (*Id.* at pp. 155–156.) Our Supreme Court also concluded that where "the available evidence points clearly to the truth of one theory and the falsity of the other, only the defendant against whom the false theory was used can show constitutionally significant prejudice." (*Id.* at p. 156.)

10

been convicted under a valid theory of attempted murder." Lopez also maintained that the district attorney's alternate argument regarding Lopez's liability as an aider and abettor was wrong because the natural and probable consequences doctrine "could have imputed the missing intent to [kill to] Lopez."

The district attorney filed a supplemental opposition arguing, inter alia, that "[t]he victim's use of the word 'they' [during his preliminary hearing testimony] signifies that there could have been more than [one] shooter"[9] and the district attorney's argument at the preliminary hearing that there was sufficient evidence supporting the GBI enhancement allegation as to Garcia would not have precluded the prosecution from arguing at a subsequent trial that Lopez was the shooter. The district attorney asserted further: "It is clear that due process prevents the prosecution from using inconsistent theories to convict two separate defendants at separate trials. We have not had a trial in Mr. Lopez's case and the rule from the case of *Sakarias* does not apply here. The fact that Mr. Garcia used a gun under Penal Code section 12022.5 is not inconsistent with the theory that Mr. Lopez also used a gun during this gang-motivated shooting. Additionally, the fact that Mr. Garcia inflicted great bodily injury on the victim is not inconsistent with Mr. Lopez inflicting great bodily injury on the victim. It is clear that the victim identified Mr. Lopez twice as the shooter. Therefore, the defendant cannot show that he could not have been convicted of attempted murder under the new law."

On August 3, 2022, the trial court held a hearing on Lopez's petition for resentencing.[10] At the hearing, Lopez's defense counsel reiterated his argument that because codefendant Garcia had admitted the GBI enhancement allegation, "he also must

---

[9] The original text reads: "The victim's use of the word 'they' signifies that there could have been more than shooter [*sic*]."

[10] The same bench officer who had presided over the preliminary hearing, Lopez's change of plea, and his sentencing decided Lopez's petition for resentencing.

11

be the shooter. Given that, . . . we need a hearing to sort out what the intents were, [and] who did what."

The trial court denied Lopez's petition, ruling as follows (August 2022 order): "My understanding of this case is that at the preliminary hearing one of the two alleged victims testified physically in court . . . . [and] [i]dentified Mr. Lopez without reservation . . . as the shooter . . . . This Court heard the preliminary hearing. [¶] As noted by [the district attorney], the only question the Court had at the end of the preliminary hearing was [about] the [section] 12022.5 and the [section] 1[2]022.7 enhancements and how they applied to the codefendant [Garcia], not Mr. Lopez, in that Mr. Lopez had been identified in court as the person who discharged the firearm. [¶] Subsequent to that, Mr. Lopez entered a plea to attempted murder. He admitted a great bodily injury enhancement, which there is no other way to argue requires personal infliction of great bodily injury. [¶] Consequently, . . . the Court feels the prima facia showing has not been met. The Court is going to respectfully deny the [petition]."

Lopez timely appealed the trial court's ruling.

## II. DISCUSSION

Lopez contends the trial court erred by denying his petition at the prima facie stage because his no contest plea to attempted murder does not establish that he acted with the intent to kill or that he admitted any such intent and his guilt could have been premised on the natural and probable consequences doctrine. Lopez further asserts that his admission of the GBI enhancement does not "alter the equation" because that enhancement "does not establish or include any intent to kill" and "applies even when the evidence affirmatively establishes that the defendant did *not* intend to kill." Lopez notes that the record demonstrates Garcia has admitted an identical enhancement, the victim suffered a single gunshot wound inflicted by one person, and although Victim 1 identified Lopez as the shooter, "other evidence strongly suggested codefendant Garcia was the person who shot" the victim. Thus, according to Lopez, his "admission of the great

12

bodily injury enhancement merely represents his acknowledgment that he could be found guilty of that enhancement and his agreement to the proposed plea disposition, not a factual admission that he was the person who shot the victim." Lopez asserts further that the district attorney's arguments at the preliminary hearing and in opposition to Lopez's petition show that the record fails to conclusively prove that Lopez "is the person who shot the victim in the back." Lastly, Lopez argues that even if the record demonstrates that he shot the victim, the trial court impermissibly made a factual finding that he was the shooter and that he acted with an intent to kill.

The Attorney General counters that the record establishes that Lopez "was convicted as the direct perpetrator, not as an aider and abettor. Because a direct perpetrator of attempted murder necessarily harbors the intent to kill, [Lopez] was ineligible for resentencing relief as a matter of law." The Attorney General asserts that Lopez's "admission of the great bodily injury allegation constituted an admission that he was the direct perpetrator of the offense, as required by section 12022.7 [citation], and direct perpetrators of attempted murder necessarily act with the intent to kill."

A. *Legal Principles*

"Senate Bill No. 1437 (Senate Bill 1437) took effect on January 1, 2019. [Citation.] The bill amended existing law on accomplice liability for murder ' "to ensure that murder liability is not imposed on a person who is not the actual killer . . . ." ' [Citations.] To accomplish this goal, Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure a person's sentence is commensurate with his individual criminal culpability." (*People v. Patton* (2023) 89 Cal.App.5th 649, 655 (*Patton*).)

As amended by Senate Bill 1437, section 188 provides in relevant part: "(a) For purposes of [s]ection 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or

13

when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189 [regarding the felony-murder rule], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Furthermore, as our Supreme Court has explained, "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848; see also *People v. Vang* (2022) 82 Cal.App.5th 64, 81; *People v. Ervin* (2021) 72 Cal.App.5th 90, 101.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) When the trial court receives a petition under section 1172.6 requesting vacatur of a conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' " (*Ibid.*, citing *People v. Lewis* (2021) 11 Cal.5th 952, 970–972 (*Lewis*), § 1172.6, subd. (c).)

During the prima facie stage of review, the trial court "may look at the record of conviction . . . to determine whether a petitioner has made a prima facie" showing. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) However, the prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Ibid.*) The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Ibid.*) " '[A] court should not reject the petitioner's factual allegations on credibility grounds without

14

first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

By its express terms, Senate Bill 1437 did not authorize a petition to vacate a conviction for any offense other than murder. After the enactment of Senate Bill 1437, the California Courts of Appeal were split on whether Senate Bill 1437 applied to attempted murder as well as murder. Some courts held that Senate Bill 1437 did not apply to attempted murder at all, others held that it applied only prospectively to attempted murder, and still others held that it applied both prospectively and retroactively to nonfinal attempted murder convictions.[11]

"In October 2021, the Governor signed Senate Bill No. 775, (Stats. 2021, ch. 551, § 2, effective January 1, 2022." (*People v. Coley* (2022) 77 Cal.App.5th 539, 544 (*Coley*).) Senate Bill 775 resolved the split of authority and amended section 1172.6 in various respects. "The bill clarified that 'persons who were convicted of attempted murder . . . under . . . the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theor[y].' "[12] (*Patton*, *supra*, 89 Cal.App.5th at p. 656.)

---

[11] On November 13, 2019, our Supreme Court granted review in *People v. Lopez* (2019) 38 Cal.App.5th 1087 on the question of whether Senate Bill 1437 applied to attempted murder liability under the natural and probable consequences doctrine. (*People v. Lopez* (Nov. 13, 2019, S258175) 2019 WL 5997422.) However, following the October 5, 2021 enactment of Senate Bill No. 775 (Stats. 2021, ch. 551, § 2) (Senate Bill 775), the Supreme Court transferred the case back to the Court of Appeal with directions to vacate its decision and reconsider the cause in light of Senate Bill 775. (*People v. Lopez* (Nov. 10, 2021, S258175) 2021 WL 5238555.)

[12] Senate Bill 775 also "address[ed] various aspects of the petition procedure, including the petitioner's right to counsel, the standard for determining the existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a court may consider at that hearing." (*Birdsall*, *supra*, 77 Cal.App.5th at p. 865; see Stats. 2021, ch. 551, §§ 1, 2.)

"[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*); see also *People v. Scott* (1997) 15 Cal.4th 1188, 1213.) An intent to kill is shown if the assailant either desires the death of the victim or knows to a substantial certainty that death will occur as the result of the assailant's action. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.)

Section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine." (*Coley*, *supra*, 77 Cal.App.5th at p. 548.) "Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852; see also *People v. Favor* (2012) 54 Cal.4th 868, 874; *People v. Miranda* (2011) 192 Cal.App.4th 398, 407–408.)

When a defendant is "found guilty of attempted murder under a natural and probable consequences theory of liability, the 'intent to kill' was imputed onto [the defendant] from the actual killer or perpetrator." (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.) "Because section 188, subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences

16

doctrine cannot prove an accomplice committed attempted murder. Accordingly, the natural and probable consequences doctrine theory . . . is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

Although a defendant can no longer be held liable for attempted murder based on the natural and probable consequences doctrine, under current law, "the sole and actual perpetrator of the attempted murder . . . is ineligible for resentencing as a matter of law." (*Patton*, *supra*, 89 Cal.App.5th at p. 657; see *People v. Garcia* (2022) 82 Cal.App.5th 956, 969 [affirming denial of resentencing because record of conviction "unequivocally establishes" defendant was the sole perpetrator and actual killer]; *People v. Harden* (2022) 81 Cal.App.5th 45, 47–48, 56 (*Harden*) [petition for resentencing may be summarily denied when, without weighing conflicting evidence or making credibility determinations, the record of conviction irrefutably establishes as a matter of law that the jury determined the defendant was the actual killer]; see also *People v. Delgadillo* (2022) 14 Cal.5th 216, 233 [defendant "not entitled to any relief under section 1172.6" because he "was the actual killer and the only participant in the killing"].)

Furthermore, "[d]irect aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775." (*Coley*, *supra*, 77 Cal.App.5th at p. 548.) "To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.] In addition, . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of

17

attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee*, *supra*, 31 Cal.4th at pp. 623–624; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Regarding the GBI enhancement under section 12022.7, subdivision (a), a defendant "who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) " '[T]he phrase "personally inflicts" means that someone "in person" . . ., that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured." ' " (*People v. Ollo* (2021) 11 Cal.5th 682, 688; see also *People v. Cole* (1982) 31 Cal.3d 568, 579 ["in enacting section 12022.7, the Legislature intended the designation 'personally' to limit the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim"]; *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 349.)

"A defendant's guilty plea or admission of a sentence enhancement allegation is deemed to constitute a judicial admission of every element of the offense charged and severely restricts the defendant's right to appeal from the ensuing judgment." (*People v. Bowie* (1992) 11 Cal.App.4th 1263, 1266.) "Admissions of enhancements are subject to the same principles as guilty pleas. . . . It waives any right to raise questions about the evidence, including its sufficiency." (*People v. Lobaugh* (1987) 188 Cal.App.3d 780, 785; see also § 1016(3).) However, a "defendant is not required to personally admit the truth of the factual basis of the plea, which may be established by defense counsel's stipulation to a particular document, such as a police report or a preliminary hearing transcript." (*People v. French* (2008) 43 Cal.4th 36, 50–51; see *People v. Thoma* (2007)

18

150 Cal.App.4th 1096, 1104 (*Thoma*) [a general stipulation to a factual basis for a plea does not amount to an admission of particular facts].)

"We independently review a trial court's determination on whether a petitioner has made a prima facie showing." (*Harden*, *supra*, 81 Cal.App.5th at p. 52.)

B. *Analysis*

Lopez contends the trial court erred by failing to issue an OSC because he had identified a scenario under which his guilt for attempted murder could rest on the natural and probable consequences doctrine and his no contest plea to attempted murder does not conclusively demonstrate that he personally acted with or admitted a specific intent to kill.

We agree. In amended count 1, the information generically charged Lopez and his two codefendants with attempted murder, alleging that they "willfully and unlawfully, and with malice attempted to murder Victim 1." Thus, the charge itself did not limit the district attorney from convicting Lopez on any available theory of attempted murder liability, which at the time of Lopez's no contest plea (in February 2021) could have included liability under the natural and probable consequences doctrine. (See *People v. Eynon* (2021) 68 Cal.App.5th 967, 977–978; *People v. Rivera* (2021) 62 Cal.App.5th 217, 233 (*Rivera*).)

As noted *ante* (pt. I.B), the record does not contain a reporter's transcript from Lopez's change of plea proceeding. Thus, we do not know whether the parties agreed to a particular theory of Lopez's liability for the attempted murder of Victim 1 when he entered his no contest plea. Although the preliminary hearing transcript was offered as a basis for Lopez's plea and admissions, the record before us does not establish that Lopez admitted at the change of plea proceeding any particular facts presented at the preliminary hearing. (See *Thoma*, *supra*, 150 Cal.App.4th at p. 1104; *Rivera*, *supra*, 62 Cal.App.5th at p. 235.)

19

Courts of Appeal are divided on the extent to which a trial court may rely on the preliminary hearing transcript to deny a petition at the prima facie showing stage. (Compare *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1166–1168 with *People v. Flores* (2022) 76 Cal.App.5th 974, 988–992 (*Flores*); see also *People v. Davenport* (2021) 71 Cal.App.5th 476, 481–484.) Nevertheless, it is well established that the trial court may not engage in factfinding at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at p. 972.) Given that the evidence presented at the preliminary hearing did not irrefutably establish that Lopez was the sole and actual perpetrator or that he aided and abetted the shooter and harbored an intent to kill, any determination that relies on the preliminary hearing transcript to find that Lopez intended to kill and was the actual perpetrator or aider and abettor would impermissibly amount to " 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Ibid.*) Thus, on this record, we conclude that Lopez's no contest plea to attempted murder alone does not conclusively establish that he was convicted on a currently viable theory of liability for attempted murder.[13]

Although Lopez's no contest plea to count 1 itself does not render him ineligible for relief under section 1172.6, we must consider whether Lopez's admission of the GBI enhancement allegation under section 12022.7, subdivision (a) necessarily and conclusively establishes that he admitted to being the actual perpetrator of the shooting who acted with an intent to kill. That is, does " '[t]he record of conviction irrefutably establish[] as a matter of law that' [Lopez] was convicted as the actual perpetrator of the attempted murder[?]" (*Patton*, *supra*, 89 Cal.App.5th at p. 658.)

Lopez contends that the GBI enhancement does not include an intent to kill requirement and his admission of the enhancement allegation does not amount to a "factual admission" that he in fact shot the victim. Moreover, he asserts the record fails

---

[13] We need not and do not weigh in on the split between the Courts of Appeal "on the import of the preliminary hearing transcript in determining whether a petitioner has made a prima facie case for resentencing." (*Flores*, *supra*, 76 Cal.App.5th at p. 989.)

to conclusively prove that he actually shot the victim or, if he did shoot the victim, that he personally acted with an intent to kill during the shooting. Lopez further claims that, given the inconclusive nature of the record, any determination of whether he shot the victim with intent to kill would involve a weighing of the evidence and factfinding that is not permitted at the prima facie stage under section 1172.6.

The Attorney General counters that by admitting to personally inflicting great bodily injury for the GBI enhancement, Lopez's liability for attempted murder was necessarily limited to his actual perpetration of the attempted murder offense, which in turn means that he pleaded no contest to harboring a specific intent to kill.

We disagree with the Attorney General's reading of the record. We agree that Lopez's admission of the enhancement establishes as a matter of law that he shot Victim 1. However, the record does *not* establish as a matter of law that he intended to kill Victim 1 and that he was the sole shooter of Victim 1.

Section 12022.7 itself does not require that a defendant intend to inflict great bodily injury, nor does it require an intent to kill. (See *People v. Elder* (2014) 227 Cal.App.4th 411, 424.) Furthermore, because we do not know from the record what, if any, specific facts Lopez may have admitted when he admitted the GBI enhancement allegation, we cannot conclusively determine whether he admitted to shooting Victim 1 with an intent to kill. (See *Rivera*, *supra*, 62 Cal.App.5th at p. 235 ["absent an indication that a defendant admitted the truth of particular facts, the stipulation to a factual basis for the plea does not 'constitute[] a binding admission for all purposes' "].) Whether Lopez harbored an intent to kill is a factual issue (see *People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946), which, on this record, would have to be gleaned from the evidence presented at the preliminary hearing and, thus, would involve impermissible factfinding at the prima facie case stage. (See *Lewis*, *supra*, 11 Cal.5th at p. 972.)

The sparse record before us does not eliminate, as a matter of law, that Lopez personally inflicted great bodily on the victim by shooting him without an intent to kill

21

and, at the same time, admitted his liability for attempted murder under the natural and probable consequences doctrine based on aiding and abetting a target offense (such as an assault with a firearm or shooting at an inhabited dwelling) perpetrated by his codefendant Garcia. That is, it is at least theoretically possible that both Lopez and Garcia fired a gun, a bullet fired by Lopez struck the victim, and, without harboring an intent to kill, Lopez aided and abetted Garcia in perpetrating the target offense (thus making him liable for attempted murder under the natural and probable consequences doctrine).

In fact, the district attorney apparently conceded in the trial court that "[t]he victim's use of the word 'they' [when testifying at the preliminary hearing] signifies that there could have been more than [one] shooter." Furthermore, the district attorney asserted that "[t]he fact that Mr. Garcia used a gun . . . is not inconsistent with the theory that Mr. Lopez also used a gun" and "the fact that Mr. Garcia inflicted great bodily injury on the victim is not inconsistent with Mr. Lopez inflicting great bodily injury on the victim."

Thus, under the circumstances in this case, Lopez's admission to inflicting great bodily injury under section 12022.7, subdivision (a), does not necessarily mean that he also admitted to being the one who perpetrated an attempted murder by solely and personally committing a direct but ineffectual act toward accomplishing an intended killing. In other words, on this record, any determination about which defendant (Lopez or Garcia) committed which acts during the incident and whether Lopez was the sole and actual perpetrator of the shooting who acted with an intent to kill Victim 1 would involve weighing the evidence and making factual determinations.

Because Lopez's petition alleged the facts necessary for relief under section 1172.6 (§ 1172.6, subds. (a)–(c)), and nothing in the record conclusively demonstrates that he is ineligible for relief as a matter of law, we conclude that Lopez's petition made a prima facie showing of entitlement to relief. (See *Lewis*, *supra*, 11 Cal.5th at pp. 970–

22

972; § 1172.6, subd. (c); see also *Strong*, *supra*, 13 Cal.5th at p. 720.) We thus reverse the trial court's August 2022 order and remand the matter to the trial court with directions to issue an order to show cause and hold further proceedings under section 1172.6.

## III. DISPOSITION

The trial court's August 3, 2022 order is reversed, and the matter is remanded with directions to issue an order to show cause and conduct further proceedings in accordance with Penal Code section 1172.6.

_____
                        Danner, Acting P.J.

WE CONCUR:

_____
Wilson, J.

_____
Bromberg, J.

**H050257**
*People v. Lopez*